**NATIONAL INDUSTRIES GROUP (HOLDING), Defendant Below, Appellant,**

v.

**CARLYLE INVESTMENT MANAGEMENT L.L.C. and TC Group, L.L.C., Plaintiffs Below, Appellees.**

No. 596, 2012.

Supreme Court of Delaware.

Submitted: May 1, 2013.
Decided: May 29, 2013.

12. *Parnes v. Bally Entertainment Corp.,* 722 A.2d 1243, 1246 (Del.1999) (Quotation and citation omitted).

Michael F. Bonkowski, Esquire (argued) and Therese Scheuer, Esquire, Cole, Schotz, Meisel, Forman & Leonard, P.A., Wilmington, Delaware, for appellant.

R. Judson Scaggs, Jr., Esquire and Angela C. Whitesell, Esquire, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware, and Robert A. Van Kirk, Esquire (argued), David S. Kurtzer–Ellenbogen, Esquire and Brian C. Rabbitt, Esquire, Williams & Connolly LLP, Washington, DC, for appellees.

Before STEELE, Chief Justice, HOLLAND, BERGER, JACOBS and RIDGELY, Justices, constituting the Court en Banc.

HOLLAND, Justice:

Carlyle Investment Management L.L.C. ("CIM") and TC Group, L.L.C. ("TC Group" and, together with CIM, "Plaintiffs" or "Carlyle") initiated this action by filing a Verified Complaint on May 28, 2010 (the "Carlyle Complaint"), against the defendant-appellant, National Industries Group (Holding) ("NIG" or "Defendant"). The Carlyle Complaint is an anti-suit injunction action. It seeks a declaratory judgment to enforce the terms of, and particularly a forum selection clause contained in, a Subscription Agreement between Carlyle Capital Corporation, Ltd. ("CCC"), a Guernsey corporation, and NIG. Specifically, it seeks an injunction against NIG from proceeding with litigation that it filed against CCC in Kuwait in December, 2009.[1]

The Court of Chancery entered a Default Judgment (the "Default Judgment") against NIG on July 13, 2011. As part of the Default Judgment, the Court of Chancery issued the anti-suit injunction. NIG filed a Motion to Vacate the Default Judgment and to Dismiss the Complaint on June 25, 2012. NIG filed an Amended Motion to Vacate on August 13, 2012. The Court of Chancery denied the Motion to Vacate on October 11, 2012.

NIG has raised several related issues on appeal. NIG contends, for a variety of reasons, that the Court of Chancery erred in refusing to vacate the Default Judgment pursuant to Court of Chancery Rule 60(b)(4) because the Default Judgment was

---

1. CIM executed the Subscription Agreement as investment manager for CCC.

void due to lack of subject matter and personal jurisdiction.

First, NIG argues that the Court of Chancery erred in refusing to vacate the Default Judgment because the court lacked personal jurisdiction over NIG, thus invalidating the Default Judgment. In support of that argument, NIG submits that Carlyle was in violation of Kuwaiti Decree Law No. 31 at the time of its sales of shares to NIG in Kuwait. According to NIG, under Kuwait law, that violation rendered the Subscription Agreement void *ab initio*.

Second, NIG contends that the Court of Chancery's limited subject matter jurisdiction does not encompass actions for which a remedy at law is available or from which no irreparable harm can result. In support of that argument, NIG asserts that subject matter jurisdiction cannot be conferred upon the Court of Chancery by contract. According to NIG, Delaware law requires only that NIG demonstrate that Carlyle had the ability to raise the forum selection clause as a defense to NIG's first filed Kuwaiti action. NIG submits that Carlyle's ability to present such a defense in Kuwait constitutes an adequate remedy at law, and that the Court of Chancery's ruling that NIG failed to establish that the Kuwait courts "would enforce" the forum selection clause is erroneous.

Finally, NIG argues that the Court of Chancery erred in refusing to vacate the Default Judgment under Rule 60(b)(6) because, in so doing, the court effectively denied NIG the opportunity to litigate its claims against Carlyle.

We have determined that NIG's claims of error are all without merit. Therefore, the judgment of the Court of Chancery must be affirmed.

## Facts [2]

The parties are large, sophisticated, international organizations. Carlyle has over $150 billion under management and has offices in 20 countries. NIG, founded 50 years ago, has over $5.5 billion in assets, and its shares are traded on the Kuwait and Dubai stock exchanges. The parties began their business relationship in 2000. Since then, NIG has invested over $80 million in various Carlyle funds.

This case arises out of NIG's investment in a particular investment fund affiliated with Carlyle—Carlyle Capital Corporation. In August, 2006, Carlyle organized CCC as a limited liability company under the laws of Guernsey, with Carlyle Investment Management serving as its investment manager. CCC's primary purpose was to invest in U.S. residential mortgage-backed securities. As part of its efforts to place shares in CCC with investors, Carlyle sent representatives to Kuwait to meet with NIG, with which Carlyle already had a substantial business relationship.

Before investing in CCC, NIG was required to represent that it was sophisticated enough to participate in the private placement. Specifically, NIG had to represent that it was a "qualified purchaser" under the Investment Company Act of 1940, meaning that it had over $25 million in assets, and was an "accredited investor" under SEC Regulation D. NIG further had to represent that it was a "qualified investor" under Guernsey law.

In December, 2006, after making these representations, NIG signed a Subscription Agreement with CCC, and committed to purchase $10 million of CCC's non-voting stock. A few weeks later, NIG invested another $15 million in CCC. All of NIG's investments were governed by the same Subscription Agreement.

2. The facts are taken from the Court of Chancery's opinion.

Paragraph 8 of the Subscription Agreement provided that any dispute "with respect to" NIG's investment would be subject to the jurisdiction of the "courts of the State of Delaware":

The courts of the State of Delaware shall have *exclusive jurisdiction over any action, suit or proceeding with respect to this Subscription Agreement* and the Investor hereby irrevocably waives, to the fullest extent permitted by law, any objection that it may have, whether now or in the future, to the laying of venue in, or *to the jurisdiction of, any and each of such courts for the purposes of any such suit, action, proceeding or judgment* and further waives any claim that any such suit, action, proceeding or judgment has been brought in an inconvenient forum, and the Investor hereby submits to such jurisdiction.[3]

The Subscription Agreement also contained a choice of law clause in paragraph 7, providing that Delaware law will apply to any dispute, "except insofar as affected by . . . state securities or 'blue sky' laws":

Notwithstanding the place where this Subscription Agreement may be executed by any of the parties, the parties expressly agree that all terms and provisions hereof shall be governed, construed and enforced solely under the laws of the State of Delaware, without reference to any principles of conflicts of law (except insofar as affected by the state securities or "blue sky" laws of the jurisdiction in which the offering described herein has been made to the Investor).

CCC was not formed at a propitious time, given that its purpose was to invest in mortgage-backed securities. CCC fell victim to the collapse of the U.S. housing market, and defaulted on its financing obligations in March, 2008, and entered liquidation in May, 2008. In September, 2009, the liquidator of CCC informed its investors that they had likely lost all of their investment.

NIG filed a complaint in a Kuwaiti court to recover its first $10 million investment in November, 2009. NIG alleged that the Subscription Agreement was "null and void" because Carlyle never had a license to sell securities in Kuwait. The complaint named as defendant "Carlyle Group," which is a trade name used by TC Group. The complaint made no reference to the forum selection clause.

NIG attempted to serve "Carlyle Group" at Carlyle's offices in Washington, D.C., on May 10, 2010. In response, Carlyle filed a complaint against NIG in the Court of Chancery on May 28, 2010, seeking a "preliminary and permanent injunction against the filing or prosecution of any action subject to the forum selection clause in the NIG Subscription Agreement in any forum other than the courts of the State of Delaware." Carlyle did not seek any money damages.

Carlyle gave NIG proper and repeated notice of the Delaware proceedings. Carlyle informally provided the complaint to NIG on June 20, 2010. Carlyle completed formal service of process on NIG under the Hague Convention on September 19, 2010, and on December 6, 2010, emailed the complaint to NIG. NIG later admitted, in briefing in the Court of Chancery, that it received actual notice, but that it made the tactical decision not to respond to any of these communications: "Believing [that the Court of Chancery] lacked personal jurisdiction over it, NIG did not respond to the Carlyle Complaint."

---

3. Emphasis added.

Carlyle moved for a default judgment against NIG on June 1, 2011. Carlyle informed NIG of this motion by FedEx and email. NIG again chose not to respond. Carlyle filed a Notice of Hearing on June 17, 2011, and again informed NIG. Carlyle chose not to appear for the hearing. On July 13, 2011, the Court of Chancery ruled on Carlyle's motion for a default judgment.

At the hearing, the Court of Chancery confirmed that there had still been no communication from NIG, and that Carlyle's request for the anti-litigation injunction had been pled in the Complaint. The Court of Chancery expressed some reticence about granting the anti-suit injunction, saying "[i]t's just not something we often like to do." In the decision that is the subject of this appeal, the Court of Chancery noted:

> This, of course, suggests that had [NIG] chosen to appear in the litigation and make its arguments at the right time, it had a fair chance to convince the court to stay its hand in the first instance, and require Carlyle to seek dismissal of the Kuwaiti action by invoking the forum selection clause in Kuwait itself. But, [NIG] did not do that, and the court was therefore required to consider the request for an injunction in the context of a motion for a default judgment.

At the hearing on the motion for a default judgment, the Court of Chancery concluded that the parties were sophisticated business entities, that the forum selection clause was enforceable, and that therefore the default judgment was "appropriate":

> These are sophisticated parties. The forum selection clause looked to me to be reasonable and enforceable, and so I have no concerns at all about entering the default judgment from a substantive standpoint, and certainly from a procedural standpoint.

> There have been extensive efforts to communicate to National Industries Group Holdings the existence of the suit, the nature of the suit, and then above and beyond that, in connection with this hearing, notices were given, and it seemed to me that every effort was made to communicate with them.

> I should also add that we are here this morning at the appointed time and no one has appeared from the other side.

> So I think that the default judgment is appropriate, and to the extent that there is any concern later on about the injunction aspect of it, that would be an appropriate subject for some Rule 60 motion before the Chancellor whose case it is.

The default judgment order permanently enjoined NIG "from filing or prosecuting any action subject to the forum selection clause contained in the NIG Subscription Agreement, including but not limited to the Kuwait Action, in any forum other than the courts of the State of Delaware." The order covered NIG's claims for $10 million that it had sued to recover in the Kuwaiti suit, and any claims that it might make on its additional $15 million investment, because both investments were covered by the Subscription Agreement that Carlyle had referenced in its complaint.

Carlyle sent NIG a copy of the ruling by email, fax, and FedEx on August 12, 2011. NIG again chose not to respond. On January 10, 2012, Carlyle, having learned that NIG was still prosecuting the Kuwaiti litigation in defiance of the default judgment anti-suit injunction against it, sent NIG a copy of the ruling by email, fax, and FedEx again. Once more, NIG chose not to reply. On April 12, 2012, NIG attempted

to serve Carlyle Investment Management in the Kuwaiti action.[4]

On June 25, 2012, NIG, after having intentionally disregarded numerous deadlines for action and opportunities to appear in this case, filed a motion in the Court of Chancery to vacate the Default Judgment and to dismiss the Carlyle Complaint. The motion alleged that the Default Judgment was void for lack of personal jurisdiction and sought relief under Rule 60(b)(4). One week later, Carlyle filed a motion to have NIG held in contempt for continuing to litigate the action in Kuwait.

NIG submitted briefing in the Court of Chancery in support of its motion to vacate. In that briefing, NIG expanded its theory of relief under Rule 60(b)(4) by arguing that the default judgment was also void for lack of subject matter jurisdiction. NIG further argued that the Court of Chancery should vacate the judgment under Rule 60(b)(6), which provides that the Court of Chancery may grant relief from a final judgment "for any other reason."

The Court of Chancery declined to reopen the final judgment. It held that the default judgment was not void for lack of either personal or subject matter jurisdiction under Rule 60(b)(4). The court also found that there was no ground to vacate the default judgment under Rule 60(b)(6).

### Personal Jurisdiction

■ NIG sought to vacate the default judgment under Rule 60(b)(4) for lack of personal jurisdiction on the basis that the Subscription Agreement was void *ab ini-*

tio. In its Kuwaiti suit and in this proceeding, NIG argues that the Subscription Agreement is invalid under Kuwaiti law because Carlyle and CCC did not obtain a license to market and sell securities in Kuwait as required by Kuwaiti Law Decree No. 31.[5] NIG contends that absent such a license, CCC could not validly issue shares to NIG or any other Kuwaiti residents. NIG argues that Kuwaiti, and not Delaware law applies to this claim, because of language in the Subscription Agreement providing that Delaware law does not apply "insofar as affected by the state securities or 'blue sky' laws of the jurisdiction in which the offering described herein has been made to the Investor."

NIG argues that violation of Decree Law No. 31 "results in nullity and invalidity" of the sale. NIG submits that Article 187 of Kuwait Civil Law provides that "if a contract becomes null and void, or [is] judged to be so, the contracting parties shall restitute their condition prior to contracting." All of this leads NIG to contend that the Subscription Agreement was and is void *ab initio.* Therefore, NIG argues, the Court of Chancery could not exercise personal jurisdiction over it.

Carlyle has three responses to NIG's submissions. First, Carlyle argues that it is not settled that the Kuwaiti securities laws can be considered a "state securities law" for the purposes of the "blue sky" carve-out.[6] Second, Carlyle contests the accuracy of NIG's arguments regarding the legal operation of Kuwaiti securities law as it relates to the Subscription Agree-

4. By this time, NIG had also amended the name of the defendant on the Kuwait Summons from "Carlyle Group" to CCC.

5. NIG also claimed in the Kuwait Summons that the Subscription Agreement was void because it was induced by fraud. Kuwait Sum-

mons ¶¶ 12–13. NIG specifically disclaimed that argument in the Court of Chancery.

6. The relevant phrase in the Subscription Agreement is "affected by the state securities or 'blue sky' laws of the jurisdiction in which the offering described herein has been made."

ment.[7] Carlyle's third and primary argument is that, even if this issue is governed by Kuwaiti law, NIG agreed the parties' rights under Kuwaiti law would be determined by the courts of Delaware. We have concluded that Carlyle's third argument is dispositive.

The Court of Chancery held that a party cannot escape a valid forum selection clause, or its analogue, an arbitration clause, by arguing that the *underlying contract* was invalid for a reason unrelated to the forum selection or arbitration clause itself, *e.g.*, the "securities law" issue.[8] Instead, the party must show that the forum selection clause *itself* is invalid. If the forum selection clause, standing alone, is found to be valid, the court having jurisdiction over the dispute is to decide whether the contract is enforceable or void *ab initio*.

■ We agree with the Court of Chancery's holding that a party cannot make "an end-run around an otherwise enforceable [f]orum [s]election [p]rovision through an argument about the enforceability of other terms in the contract," *i.e.* the "state securities" clause.[9] NIG has not cited any Delaware case law to support the contrary proposition.[10] Moreover, Carlyle submits,

---

**7.** NIG bases its argument on two affidavits of Mr. Magied, its expert on Kuwaiti law. In Mr. Magied's view, Article 3 of Decree Law No. 31 of 1990 requires that any sale of securities of any kind, whether to a sophisticated investor like Carlyle in a private sale, or in a public offering to any investors regardless of sophistication, be made only by a person or entity who has received a license from the Minister of Commerce and Industry, and who is either Kuwaiti or has a licensed Kuwaiti agent.

Carlyle's expert, Mr. Awadhi, who is a Kuwaiti lawyer, testified that Article 3 of Decree Law No. 31, which provides that a license is required in the case of "operations of sale and purchase of foreign securities and participations in foreign investment funds," should be read as applying only to transactions involving *existing* securities, not newly issued stock. In support of this testimony, Mr. Awadhi notes that Article 1 of Decree Law No. 31 specifically governs initial public offerings. Therefore, according to Mr. Awadhi, if any provision of Kuwaiti securities laws should apply, it would be this one. According to Mr. Awadhi, Article 1 limits itself to "public subscription[s]," and that it has nothing to say about private offerings, such as this one. We need not address this disagreement.

**8.** *See, e.g., Scherk v. Alberto–Culver Co.,* 417 U.S. 506, 519 n. 14, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974) ("[A]n arbitration or forum-selection clause in a contract is not enforceable if the *inclusion of that clause in the contract* was the product of fraud or coercion.") (em-

phasis added); *Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403–04, 87 S.Ct. 1801, 18 L.Ed.2d 1270 (1967) (holding that a federal court may adjudicate a question of "fraud in the inducement in the arbitration clause itself"); *Afram Carriers, Inc. v. Moeykens,* 145 F.3d 298, 302 (5th Cir.1998) ("Only when we can discern that the [forum selection] clause itself was obtained in contravention of the law will the federal courts disregard it. . . ."); *Maloney–Refaie v. Bridge at School, Inc.,* 958 A.2d 871, 886 (Del.Ch.2008) (noting federal precedent that "arbitration agreements are severable and independently enforceable from the contract as a whole"); *Anadarko Petroleum Corp. v. Panhandle E. Corp.,* 1987 WL 13520, at *11 (Del.Ch. July 7, 1987) (enforcing an agreement to arbitrate where the plaintiff did not "separately attack the validity of the arbitration clause").

**9.** *See Ashall Homes Ltd. v. ROK Entm't Grp. Inc.,* 992 A.2d 1239, 1248 (Del.Ch.2010) (citing *Karish v. SI Int'l, Inc.,* 2002 WL 1402303, at *4 (Del.Ch. June 24, 2002) ("A claim of fraud in the inducement of the contract generally—as opposed to the arbitration clause itself—is for the arbitrators and not for the courts.")).

**10.** NIG cites the Alabama case of *Investors Guar. Fund, Ltd. v. Compass Bank,* 779 So.2d 185 (Ala.2000). The facts in that case are distinguishable, and therefore, the reasoning of the Supreme Court of Alabama is not applicable to this case.

the *Huffington v. T.C. Group, LLC*,[11] case upon which NIG seeks to rely, actually supports the Court of Chancery's decision.

In *Huffington v. T.C. Group*, the plaintiff made an investment in CCC under a subscription agreement that was, in relevant part, identical to the one at issue in this case.[12] The plaintiff, a Massachusetts investor, brought claims against Carlyle under Massachusetts's blue sky laws. The United States Court of Appeals for the First Circuit agreed with the plaintiff that those claims fell into the "blue sky" exception in the Subscription Agreement, and that Massachusetts law governed these claims.[13] But, the First Circuit did not agree that the Massachusetts claims must be adjudicated by a Massachusetts court. Instead, the First Circuit held that these claims had to be adjudicated in a Delaware court under the forum selection clause.[14] Similarly, we hold that any claim NIG might have under Kuwaiti securities laws must be decided by the courts of Delaware rather than of Kuwait.

■ A valid forum selection clause must be enforced.[15] In *M/S Bremen v. Zapata Off–Shore Co.*,[16] the United States Supreme Court held that the forum selection clauses are generally valid, unless the resisting party can "clearly show that enforcement would be unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching."[17] This Court recognized and applied that principle in *Ingres Corp. v. CA, Inc.*[18] Accordingly, NIG, as the party attempting to vacate the default judgment on the grounds that the Court of Chancery lacked personal jurisdiction over it, bears the burden of establishing one of the recognized exceptions.[19]

NIG does not argue that the forum selection clause was the product of fraud or overreaching.[20] NIG acknowledges that it freely and voluntarily submitted to the personal jurisdiction of the courts of Delaware. Where the parties to the forum selection clause have consented freely and knowingly to the court's exercise of jurisdiction, the clause is sufficient to confer personal jurisdiction on a court.[21] Therefore, we hold that NIG's motion to vacate

---

11. *Huffington v. T.C. Grp. LLC*, 637 F.3d 18 (1st Cir.2011).

12. *Id.* at 20.

13. *Id.* at 22.

14. *Id.* at 25.

15. *E.g.*, *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 103 (2d Cir.2006) ("[A] forum-selection clause will be upheld unless the clause was obtained through fraud or over-reaching.") (internal quotation omitted).

16. *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

17. *Id.* at 15, 92 S.Ct. 1907.

18. *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del.2010) (quoting *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. at 15, 92 S.Ct. 1907).

19. The Court of Chancery properly recognized that normally, the plaintiff bears the burden of showing that the court has jurisdiction over a defendant. But, if the defendant has conceded a default judgment, and is attacking it collaterally under Rule 60(b)(4), the defendant bears the burden of showing that the court lacked jurisdiction. *See, e.g., Philos Technologies, Inc. v. Philos & D, Inc.*, 645 F.3d 851, 855–57 (7th Cir.2011).

20. NIG also claimed in the Kuwait Summons that the Subscription Agreement was void because it was induced by fraud. Kuwait Summons ¶¶ 12–13. NIG specifically disclaimed that argument in the Court of Chancery.

21. *E.g., Nat'l Equip. Rental, Ltd. v. Szukhent*, 375 U.S. 311, 315–16, 84 S.Ct. 411, 11 L.Ed.2d 354 (1964) ("[I]t is settled ... that parties to a contract may agree in advance to submit to the jurisdiction of a given court....").

the Default Judgment under Rule 60(b)(4) for lack of personal jurisdiction was properly denied by the Court of Chancery.

### Subject Matter Jurisdiction

▮▮▮▮ It is well-established that the Court of Chancery has subject matter jurisdiction where (among other things) a party: 1) seeks an equitable remedy, such as specific performance or an injunction, and 2) lacks an adequate remedy at law. Indeed, the "Court of Chancery has *exclusive* jurisdiction where injunctive relief is sought." [22] NIG argues, however, that this Court's decision in *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*[23] establishes that the Court of Chancery does not have subject matter jurisdiction to grant an injunction or to order specific performance in aid of Carlyle's rights under the forum selection clause because Carlyle has an adequate remedy at law.

This Court's decision in *El Paso* was based upon the facial invalidity of the forum selection clause.[24] El Paso's argument "rest[ed] upon the faulty premise that jurisdiction in the Delaware Court of Chancery is a right that could be created by contract." [25] Because El Paso had no power to confer exclusive jurisdiction over all disputes, including purely legal ones, on the Court of Chancery, there was no right that could be enforced by an anti-suit injunction.[26] Because the forum selection clause was facially invalid, we held that El Paso had no basis to argue that it was suffering an irreparable injury by being compelled to litigate in Texas, because the rights it sought to enforce never legally existed.[27]

The forum selection clause in this case differs from the one in *El Paso*, because it confers jurisdiction on "the courts of the State of Delaware," not solely on the Court of Chancery. Here, Carlyle came to the Court of Chancery—rather than Superior Court—to enforce the forum selection clause, because the Court of Chancery is the Delaware court that is constitutionally and statutorily empowered to grant injunctions and to order specific performance.[28] Nevertheless, NIG relies on the following quote from *El Paso* to support its argument that the Court of Chancery can never enjoin an action brought in violation of a *valid* forum selection clause because raising the clause as a defense in the foreign forum is always an adequate legal remedy:

> The Court of Chancery correctly determined, *inter alia*, that El Paso could raise the forum selection clause in the Settlement Agreement as a defense in the first filed Texas action and, if successful, recover the costs of that litigation. It further held that the ability to raise the forum selection claim as a defense in the Texas action was an adequate remedy at law. We agree.[29]

In furtherance of its argument, NIG alleges that the Court of Chancery erroneously ruled that NIG failed to establish that the Kuwait courts "would enforce" the forum selection clause in the Subscription Agreement. Therefore, NIG argues, Car-

22. *Kerns v. Dukes*, 707 A.2d 363, 368 (Del. 1998) (emphasis added).

23. *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*, 669 A.2d 36 (Del.1995).

24. *See, e.g.*, 669 A.2d at 39–41.

25. *Id.* at 40.

26. *Id.*

27. *Id.*

28. Del. Const. art. 4, § 10; Del.Code Ann. tit. 10, §§ 341–42.

29. *El Paso Natural Gas Co. v. TransAmerican Natural Gas Corp.*, 669 A.2d at 40.

lyle has an adequate remedy at law in the courts of Kuwait and thus is not entitled to equitable relief in Delaware. Therefore, NIG insists that Carlyle must litigate in Kuwait the enforceability of the forum selection clause that provides Carlyle was not required to litigate in Kuwait or any other court not in Delaware.

Alternatively, Carlyle argues that our holding in *Ingres* is controlling. In *Ingres*, this Court held that the Court of Chancery has subject matter jurisdiction to enjoin violations of a valid forum selection clause. In *Ingres*, the plaintiff, CA, Inc., filed suit in the Court of Chancery to enjoin the defendant, Ingress Corporation, "from prosecuting the California Action" that Ingres had filed in derogation of several forum selection clauses.[30] The clauses in *Ingres* specified Delaware or New York as the exclusive fora for "any action or proceeding in respect of any claim directly arising out of or related to" the agreements.[31] In *Ingres*, the Court of Chancery granted CA's request and enjoined the California suit.[32]

■ On appeal, in *Ingres*, this Court held that the Court of Chancery "did not err in enjoining Ingres from prosecuting its . . . claims [outside of Delaware]" in violation of the forum selection clauses.[33] "[W]here contracting parties have expressly agreed upon a legally enforceable forum

selection clause, a court should honor the parties' contract and enforce the clause[.]"[34] Under Delaware law, this Court explained, "[f]orum selection clauses are presumptively valid and should be specifically enforced" through an injunction.[35]

NIG argues, however, that *Ingres* is distinguishable "because in that case plaintiffs plead[ed] equity jurisdiction apart from the forum selection clause." NIG's argument fails to recognize the significance of the fact that in *Ingres*, this Court affirmed the issuance of an anti-suit injunction. In doing so, this Court agreed that: CA had the right to seek an equitable remedy—*i.e.*, an injunction—specifically enforcing the clause; and that CA stood to be irreparably harmed by Ingres's breach.[36] To find that CA would suffer irreparable harm absent an anti-trust injunction, this Court had to conclude that CA lacked an adequate remedy at law.[37] It made no difference that, in *Ingres*, CA also sought injunctive relief to enforce provisions other than the forum selection clauses.

■ The Court of Chancery recently relied on our holding in *Ingres* to find subject matter jurisdiction over a similar dispute.[38] In *ASDC Holdings v. Malouf*, the plaintiffs filed suit in the Court of Chancery to enjoin the defendants from litigating in Texas in violation of an exclu-

---

30. *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1145 (Del.2010).

31. *Id.* at 1145 n. 1.

32. *See CA, Inc. v. Ingres Corp.*, 2009 WL 4575009, at *5, *46–48 (Del.Ch. Dec. 7, 2009).

33. *Ingres Corp. v. CA, Inc.*, 8 A.3d at 1147.

34. *Id.* at 1145.

35. *Id.* at 1146 (alteration and internal quotation marks omitted).

36. *See Draper Commc'ns, Inc. v. Delaware Valley Broadcasters LP*, 505 A.2d 1283, 1288

(Del.Ch.1985) (irreparable harm required for preliminary and permanent injunctive relief.)

37. *See Horizon Pers. Commc'ns, Inc. v. Sprint Corp.*, 2006 WL 2337592, at *24 (Del.Ch. Aug. 4, 2006) ("Irreparable harm 'consists of harm for which there can be no adequate recompense at law.' ").

38. *See ASDC Holdings, LLC v. Richard J. Malouf 2008 All Smiles Grantor Retained Annuity Trust*, 2011 WL 4552508 (Del.Ch. Sept. 14, 2011) ("*Malouf*").

sive Delaware forum selection clause.[39] The *Malouf* defendants argued that the Court of Chancery lacked subject matter jurisdiction because the plaintiffs could raise the clause as a defense in Texas, and therefore had an adequate remedy at law.[40] Relying on *Ingres*, the Court of Chancery properly rejected that argument. In *Malouf*, the Court of Chancery explained that requiring the plaintiffs "to litigate the forum selection issue in Texas, when they bargained for a contractual provision that would avoid such a result, would deprive Plaintiffs of the benefit of their bargain and cannot be an adequate remedy at law." [41]

The United States Supreme Court has recognized that there are "compelling reasons why a freely negotiated private international agreement, unaffected by fraud, undue influence, or overweening bargaining power"—such as the Subscription Agreement in this case—"should be given full effect." [42] Uncertainty and possibly great inconvenience to both parties could arise if litigation could be maintained in any jurisdiction.[43] "The elimination of all such uncertainties by agreeing in advance on a forum acceptable to both parties is an indispensable element in international trade, commerce, and contracting." [44]

The remedy of an injunction has deep roots in English law that are traceable to at least 15th-century England.[45] The Court of Chancery's ability to enter an anti-suit injunction derives from its equitable powers which are commensurate with the historic power of the Court of Chancery in England. That injunctive power allows the Court of Chancery to restrain a party that is subject to its jurisdiction from proceeding in a foreign court.

Recently, in *Donohue v. Armco Inc.*,[46] an English court granted an anti-suit injunction where parties filed suit in New York in contravention of a forum selection clause designating England as the forum.[47] In doing so, the court said "the general rule is clear: where parties have bound themselves by an exclusive jurisdiction clause effect should ordinarily be given to that obligation in the absence of strong reasons for departing from it." [48] Similarly, in *Continental Bank N.A. v. Aeakos Compania Naviera S.A.*,[49] another English court upheld an anti-suit injunction stating:

39. *Id.* at *2–3.

40. *Id.* at *3.

41. *Id.* at *6. *See also Gen. Protecht Grp., Inc. v. Leviton Mfg. Co.*, 2010 WL 5559750, at *25–26 (D.N.M. Nov. 30, 2010), *aff'd*, 651 F.3d 1355 (Fed.Cir.2011). Delaware courts have long recognized that requiring a party to litigate in violation of an arbitration clause constitutes irreparable harm. *See, e.g., HDS Inv. Holding Inc. v. Home Depot, Inc.*, 2008 WL 4606262, at *9 (Del.Ch. Oct. 17, 2008). And an arbitration clause "is, in effect, a specialized kind of forum-selection clause." *Scherk v. Alberto–Culver Co.*, 417 U.S. 506, 519, 94 S.Ct. 2449, 41 L.Ed.2d 270 (1974).

42. *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 12–13, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

43. *Id.* at 13, 92 S.Ct. 1907.

44. *Id.* at 13–14, 92 S.Ct. 1907.

45. *See* David W. Raack, *A History of Injunctions in England Before 1700*, 61 Ind. L.J. 539, 545–56 (1986).

46. *Donohue v. Armco Inc.*, [2002] 1 Lloyd's Rep. 425 (H.L.).

47. *Id.* at 432–33.

48. *Id.* at 433.

49. *Cont'l Bank N.A. v. Aeakos Compania Naviera S.A.*, [1994] 1 Lloyd's Rep. 505 (Eng.).

In our view the decisive matter is that the bank applied for the injunction to restrain the defendants' clear breach of contract. In the circumstances, a claim for damages for breach of contract would be a relatively ineffective remedy. . . . If the injunction is set aside, the defendants will persist in their breach of contract, and the bank's legal rights as enshrined in the jurisdiction agreements will prove to be valueless. [T]his is the paradigm case for the grant of an [injunction enforcing an] exclusive jurisdiction agreement.[50]

That same English court also stated that the continuation of foreign proceedings "amounts to vexatious and oppressive conduct on the part of the defendants."[51]

Forum selection clauses have become a vital part of interstate and international commercial agreements.[52] Undoubtedly, the parties to the Subscription Agreement in this case conducted their negotiations "with the consequences of the forum clause figuring prominently in their calculations."[53] "A clause establishing *ex ante* the forum for dispute resolution has the salutary effect of dispelling any confusion about where suits arising from the contract must be brought and defended. . . ."[54] Forum selection clauses afford the parties an opportunity to agree to have any disputes between them resolved in a neutral forum of their mutual choice that has expertise in the subject matter.

In this case, the parties agreed that the courts of Delaware meet their standards of neutrality and expertise in commercial litigation. The choice of Delaware as a forum was made in an arm's-length negotiation by experienced and sophisticated parties. Thus, "absent some compelling and countervailing reason it should be honored by the parties and enforced by the courts."[55]

Even if *arguendo*, the courts of Kuwait would enforce the forum selection clause in the Subscription Agreement, requiring Carlyle to enforce the forum selection clause in Kuwait, when Carlyle bargained for a Subscription Agreement provision that precluded such litigation, would deprive Carlyle of the benefit of its bargain. Therefore, that is not an adequate remedy at law. To the extent that our decision in *El Paso* is inconsistent with our holding in this case or *Ingres, El Paso* is overruled.

In this case, as in *Ingres*, the Subscription Agreement contains a valid forum selection clause that vests exclusive jurisdiction and venue in the courts of Delaware. It is axiomatic that both an equitable remedy and the lack of an adequate remedy at law are elements needed here to establish the Court of Chancery's subject matter jurisdiction. In *Ingres*, we necessarily held that both elements were satisfied. The record reflects that Carlyle has likewise established that those two predicates for subject matter jurisdiction existed over Carlyle's request to enforce the Subscription Agreement's forum selection clause by an anti-suit injunction.

Carlyle would suffer irreparable harm if it were required to litigate in Kuwait in contravention of the bargain it struck with NIG that is set forth in the forum selection

---

50. *Id.* at 512.

51. *Id.*

52. *See M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. 1, 13–14, 92 S.Ct. 1907, 32 L.Ed.2d 513 (1972).

53. *Id.* at 14, 92 S.Ct. 1907.

54. *Carnival Cruise Lines, Inc. v. Shute*, 499 U.S. 585, 593–94, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991).

55. *M/S Bremen v. Zapata Off–Shore Co.*, 407 U.S. at 12, 92 S.Ct. 1907.

clause of the Subscription Agreement. Carlyle has no adequate remedy other than an anti-suit injunction. Therefore, Carlyle was entitled to equitable relief by having the forum selection clause specifically enforced in the Court of Chancery by the issuance of an anti-suit injunction.

Accordingly, we hold that NIG's motion to vacate the Default Judgment under Rule 60(b)(4) for lack of subject matter jurisdiction was properly denied by the Court of Chancery.

### No Rule 60(b)(6) Relief Available

■ NIG also challenged the forum selection clause under Court of Chancery Rule 60(b)(6), on the basis that enforcing the clause would deny NIG the right to litigate its claims against Carlyle. NIG argues that the Court of Chancery abused its discretion by not vacating the Default Judgment because NIG's suit is now time-barred except in Kuwait.[56] Rule 60(b)(6) allows the Court of Chancery to vacate a judgment if the movant can sufficiently show "any other reason justifying relief." Rule 60(b)(6) "encompasses circumstances that could not have been addressed using other procedural methods, [that] constitute an 'extreme hardship,' or [when] 'manifest injustice' would occur if relief were not granted."[57]

However, where, as here, conduct "has been intentional or willful," Rule 60(b)(6) "cannot be used 'to relieve a party from the duty to take legal steps to protect his interests.' "[58] In denying NIG's motion un-der Rule 60(b)(6), the Court of Chancery stated:

> [NIG] argues that a forum selection clause is not enforceable where its enforcement would leave a party without any forum to litigate its action. But [NIG] offers little authority for the dubious proposition that a forum selection clause is rendered unenforceable because a party, through its own choices, has caused the statute of limitations in the contractually chosen forum to expire. In this circumstance, where [NIG]'s own voluntary decision to violate the forum selection clause and to duck this litigation for more than two years may have left it without a forum, [NIG] has no equitable basis to ask that this court endorse its breaching behavior by lifting the default judgment. [NIG] voluntarily signed the forum selection clause and it has known since this suit was filed that Carlyle intended to enforce it. Instead of participating in this suit in a timely way or otherwise acting to bring its claims in Delaware promptly, [NIG] chose to flout this case and take the chance that it would get away with violating the forum selection clause.

In support of its ruling, the Court of Chancery cited the Delaware Superior Court's decision in *Huffington v. T.C. Group*,[59] in which the plaintiff also sought to recover his investment in the CCC.[60] He filed suit in Massachusetts, asserting claims under a Massachusetts blue sky law, despite the existence of a similar fo-

56. *See MCA, Inc. v. Matsushita Elec. Indus. Co., Ltd.*, 785 A.2d 625, 633 (Del.2001).

57. *Wolf v. Triangle Broad. Co., LLC*, 2005 WL 1713071, *1 (Del.Ch. July 18, 2005) (internal citations omitted).

58. *Phillips v. Siano*, 1999 WL 1225245, at *4 (Del.Super.Ct. Oct. 29, 1999) (citation omitted).

59. *Huffington v. T.C. Grp., LLC*, 2012 WL 1415930, at *4–10 (Del.Super.Ct. Apr. 18, 2012).

60. *Id.* at *1.

rum selection clause requiring litigation to be brought in Delaware.[61]

After the United States Court of Appeals for the First Circuit affirmed the dismissal of his complaint in Massachusetts, the plaintiff in *Huffington* filed his claims in the Superior Court.[62] When those claims were filed, they were already barred by the statute of limitations.[63] The Superior Court refused to apply the Delaware borrowing statute, which would have allowed the plaintiff in *Huffington* to assert his claims in Delaware, because the plaintiff "tried to avoid the clear and unambiguous forum selection clause by filing in [the foreign forum]. He clearly sought to avoid litigating his claims here. Sometimes when you gamble, you lose." [64]

In this case, the record reflects that Carlyle filed suit in the Court of Chancery in May, 2010, only two years after CCC was placed into liquidation. NIG was served through the Hague Convention in September, 2010, when substantial time remained to file any claim under title 19, section 8106 of the Delaware Code, the statute of limitation that NIG cites. Had NIG done that, NIG could have raised and preserved its jurisdictional arguments, but ensured that it still could proceed in Delaware, if necessary. However, NIG chose not to do that. Instead, NIG unilaterally decided that it was not subject to jurisdiction in Delaware, disregarded service of process, willfully ignored repeated commu-

nications from Carlyle, and failed to attend the July, 2011 hearing. NIG then waited another year to seek to vacate the Default Judgment entered against it by the Court of Chancery.

Under these circumstances, the Court of Chancery properly denied NIG's motion to vacate the Default Judgment pursuant to Rule 60(b)(6).

### Comity and Contracts

 NIG argues that enforcing the Subscription Agreement in Delaware would be a breach of international comity. International comity is an "abstention doctrine," [65] under which a court that has jurisdiction over a person or dispute, after considering the "relevant factors," *may* abstain from exercising jurisdiction and defer to a foreign court.[66] However, all of the considerations that might weigh in favor of the application of the doctrine of international comity may be superseded by a contractual agreement that includes a forum selection clause.

The enforcement of an international forum selection clause is not an issue of comity. It is a matter of contract enforcement and giving effect to substantive rights that the parties have agreed upon. An anti-suit injunction operates *in personam* to enjoin the breaching party, not the foreign court.[67] The Court of Chancery properly concluded NIG has not demonstrated that the forum selection clause

---

**61.** *Id.* at *2.

**62.** *Id.*

**63.** *Id.* at *4.

**64.** *Id.* at *9.

**65.** *Ungaro–Benages v. Dresdner Bank AG,* 379 F.3d 1227, 1237 (11th Cir.2004).

**66.** *See, e.g., Royal & Sun Alliance Ins. Co. of Canada v. Century Int'l Arms, Inc.,* 466 F.3d 88, 95 (2d Cir.2006); *Finova Capital Corp. v.*

*Ryan Helicopters U.S.A., Inc.,* 180 F.3d 896, 898–99 (7th Cir.1999).

**67.** *E. & J. Gallo Winery v. Andina Licores S.A.,* 446 F.3d 984, 989 (9th Cir.2006); *Kaepa, Inc. v. Achilles Corp.,* 76 F.3d 624, 626–27 (5th Cir.1996); *Int'l Equity Invs., Inc. v. Opportunity Equity Partners,* 427 F.Supp.2d 491, 502 (S.D.N.Y.2006), aff'd in relevant part, 246 Fed.Appx. 73 (2d Cir.2007).

should be held unenforceable on grounds of international comity.

### Conclusion

The judgment of the Court of Chancery is affirmed.